# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# (HOUSTON DIVISION)

| | |
|---|---|
| AGIRA, S.A., an Argentine corporation<br><br>Plaintiff,<br><br>vs.<br><br>PETRÓLEOS DE VENEZUELA, S.A., a Venezuelan corporation, BARIVEN, S.A., a Venezuelan corporation, and PDVSA SERVICES, INC., a Delaware corporation,<br><br>Defendants. | Case No. 4:24-CV-1922<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

**COMES NOW** the Plaintiff, Agira, S.A. ("Plaintiff" or "Agira"), an Argentine corporation, by and through its undersigned counsel, and presents herewith its Complaint against Defendants PETRÓLEOS DE VENEZUELA, S.A., a Venezuelan corporation ("PDVSA"); BARIVEN, S.A., a Venezuelan corporation ("Bariven"); and PDVSA SERVICES, INC., a Delaware corporation ("PDVSA Houston," collectively with PDVSA and Bariven, the "Defendants," together with Agira, the "Parties"), and states as follows:

## PARTIES

1. Plaintiff <u>Agira, S.A.</u> is an Argentine corporation that maintains its principal place of business in the Autonomous City of Buenos Aires, Republic of Argentina. Agira is a leading manufacturer and vendor of compression of natural gas technology and other equipment used in the oil and gas industry. It sells its products globally to the United States, Brazil, Malaysia, Portugal, Spain, Uruguay, and elsewhere.

2. Defendant PETRÓLEOS DE VENEZUELA, S.A. is a corporation existing under the laws of the Bolivarian Republic of Venezuela. PDVSA is the Venezuelan state-owned oil and

gas company. PDVSA conducts business throughout the world, including this District, through various alter egos, structured as subsidiaries or other affiliates. PDVSA may be considered an agency or instrumentality of a foreign state under 28 U.S.C. § 1603(b), but at all times relevant to this Complaint was engaged in commercial activity either carried on (i) in the United States; or (ii) outside the United States but causing a direct effect in the United States.

3. Because this proceeding arises out of business conducted in Texas by PDVSA, but PDVSA does not maintain a regular place of business in Texas and has not designated an agent for service of process in Texas, the Texas Secretary of State is PDVSA's agent for service of process.[1] Alternatively, or in conjunction with service on PDVSA through the Texas Secretary of State, PDVSA may be served with process at its principal place of business pursuant to The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Service Convention"), to which Venezuela is a party.[2] PDVSA maintains its principal place of business at Avenida Libertador, con calle El Empalme, Complejo Min Petróleo-PDVSA, La Campiña, Caracas, Venezuela.

4. Defendant BARIVEN, S.A. is a corporation, existing under the laws of the Bolivarian Republic of Venezuela. Bariven is a wholly-owned subsidiary of PDVSA. Bariven serves as a purchasing agent for PDVSA. Bariven purchases, on PDVSA's behalf, materials necessary for PDVSA's operations. On information and belief, this role as a purchasing agent is Bariven's sole corporate purpose. On information and belief, Bariven maintains its principal place of business at the same address as PDVSA in Caracas, Venezuela and, on information and belief, Bariven does not engage in any commercial activities independent from PDVSA's commercial

---

[1] *See* Tex. Civ. Prac. & Rem. Code § 17.044.

[2] *See* 28 U.S.C. § 1608(b)(2).

activities. On information and belief, Bariven owns few, if any assets, but assumes all of the liabilities for PDVSA's procurements. On information and belief, the Venezuelan government does not respect the corporate separateness of PDVSA and Bariven. The "shipping marks" field on purchase orders putatively issued by Bariven designate *both* Bariven and PDVSA at the same Venezuelan address as the consignee of goods shipped under such orders.

5. Because this proceeding arises out of business conducted in Texas by Bariven (on behalf, and as part, of PDVSA), but Bariven does not maintain a regular place of business in Texas and has not designated an agent for service of process in Texas, the Texas Secretary of State is PDVSA's agent for service of process.[3] Alternatively, or in conjunction with service on Bariven through the Texas Secretary of State, Bariven may be served with process at its principal place of business pursuant to the Hague Service Convention to which Venezuela is a party. On information and belief, Bariven maintains its principal place of business at Avenida Libertador, con calle El Empalme, Complejo MinPetróleo, PDVSA, La Campiña, Caracas, Venezuela.

6. Defendant PDVSA SERVICES, INC. is a Delaware corporation, based in Houston, Texas, that, on information and belief, is a directly or indirectly wholly-owned subsidiary of PDVSA. PDVSA Houston serves as a general agent and purchasing agent for PDVSA and/or Bariven. PDVSA Houston renders procurement support services to PDVSA and PDVSA's alter egos, including Bariven. On information and belief, this role as agent is PDVSA Houston's sole corporate purpose. On information and belief, PDVSA Houston does not engage in any commercial activities independent from PDVSA's and Bariven's commercial activities. On information and belief, PDVSA Houston owns few, if any assets. On information and belief, the

---

[3] *See* Tex. Civ. Prac. & Rem. Code § 17.044.

3

Venezuelan government does not respect the corporate separateness of PDVSA, Bariven, and PDVSA Houston.

7. On information and belief, PDVSA Houston maintains its principal place of business at 1293 Eldridge Parkway in Houston, Texas, and continues to regularly do business in Texas, despite filing a Certificate of Withdrawal of Registration with the Texas Secretary of State on October 26, 2022. Within the Certificate of Withdrawal, PDVSA Houston consents to service of process by service on the Texas Secretary of State for any suits or proceedings "arising in the state during the time [PDVSA Houston] was authorized to transact business in this state."

8. Moreover, because this proceeding arises out of business conducted in Texas by PDVSA Houston (on behalf, and as part, of PDVSA and Bariven), and PDVSA Houston maintains a regular place of business in Texas but does not currently have an agent for service of process registered for Texas, the Texas Secretary of State is PDVSA's agent for service of process.[4] Alternatively, or in conjunction with service on PDVSA Houston through the Texas Secretary of State, PDVSA Houston may be served through its registered agent in Delaware, the Corporation Trust Center, at 1209 Orange Street, Wilmington, Delaware.

9. Defendants PDVSA, Bariven, and PDVSA Houston are alter egos of each other. At all relevant times, each of the parties was engaged in commercial activity carried on in the United States, or outside the United States and causing a direct effect within the United States, and none of the parties is entitled to immunity under Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, *et al*.

---

[4] *See* Tex. Civ. Prac. & Rem. Code § 17.044.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because PDVSA is a "foreign state" for the purposes of that section that is not entitled to immunity under 28 U.S.C. §§ 1605-1607. The Court further has subject matter over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of a foreign state, Defendant PDVSA Houston is a citizen of a U.S. state, there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.00.

11. This Court has personal jurisdiction over the Defendants because Defendant Bariven (and thus its alter egos PDVSA and PDVSA Houston) expressly consented to this Court's jurisdiction in the agreements from which this dispute arises.[5]

12. Additionally, this Court has personal jurisdiction over each of the Defendants because the applicable contracts were negotiated and performed in part in Houston, Texas. Through the activities of PDVSA Houston, the Defendants maintain continuous and systematic contacts with, and regularly transact business within, the State of Texas.

13. Finally, the Court has personal jurisdiction over PDVSA (and thus its alter egos Bariven and PDVSA Houston) pursuant to 28 U.S.C. § 1330(b) because the Court has subject matter jurisdiction over the causes of action set forth herein pursuant to 28 U.S.C. § 1330(a).

14. Venue is proper because Defendant Bariven (and thus its alter egos PDVSA and PDVSA Houston) agreed to resolve their disputes in the courts of Harris County, Texas. Venue is also proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving

---

[5] *See* Purchase Order 5100119843 § 22, attached hereto as **Exhibit A** ("The Parties Agree that the exclusive jurisdiction for all disputes arising from or related to the Order shall be the applicable State and Federal courts of Harris County, Texas."); Purchase Order 5100122517 § 22, attached hereto as **Exhibit C** (same).

rise to the claim occurred within this District and a defendant is subject to the court's personal jurisdiction with respect to this action.

## FACTUAL BACKGROUND

15. This case arises from the Defendants' failure to pay for millions-of-dollars-worth of compressed natural gas equipment and parts delivered by Agira to them.

### A. The Parties' Commercial Relationship

16. The Parties have been engaged in a commercial relationship since 2005. Principally, Agira has sold natural gas compressors used by PDVSA in vehicle fueling stations it owes and operates in Venezuela.

17. The parties repeated course of dealing was as follows:

   a. one of the Defendants would issue a "request for quotation;"

   b. Agira would respond with a quote;

   c. one of the Defendants would issue a "purchase order;"

   d. Agira would issue one or more invoices for the transaction; and then

   e. Agira would deliver the goods to one of the Defendants.

18. Some of the Defendants' requests for quotation included a section, headed "Terms and Conditions for Goods Purchases," and some did not.

19. Some of the Defendants' purchase orders included a section, headed "Terms and Conditions for Goods Purchases," and some did not.

20. All of the Defendants' purchase orders included a section headed, "Important Instructions to Seller" which included the following statement: "This purchase order is subject to the present standard BARIVEN, S.A. . . . Terms and Conditions which are already in your possession."

21. Over the course of the Parties' years-long relationship, the Defendants usually did not pay Agira's invoices until many months after Agira's delivery of the goods. Often, Defendants waited for a year or more after the delivery of the goods to pay Agira's invoices.

22. Despite the long payment periods, the Defendants would always ultimately pay Agira.

23. Agira came to expect that the Defendants would not pay Agira's invoices for months, if not years, from the date of delivery of the goods in satisfaction of any particular purchase order.

24. Agira made more than 50 shipments to the Defendants in this manner since 2005.

**B.** **Invoice '656**

25. On or about September 26, 2014, the Defendants issued Request for Quotation no. 6000437436 ("Request '436") to Agira for the delivery of spare parts, such as engines and pumps, to use with new compressors that the Defendants requested through separate Requests for Quotation.

26. On or about February 9, 2015, the Defendants issued Purchase Order no. 5100119843 ("PO '843") for the purchase of the spare parts requested pursuant to Request '436. A true and correct copy of PO '843 is attached hereto as **Exhibit A**.

27. On information and belief, the Defendants prepared PO '843 in Houston, Texas. The Defendants instructed Agira to send its invoice to the Defendants in Houston, Texas.

28. On or about March 3, 2016, Agira issued Invoice no. 99-00000656 ("Invoice '656") to the Defendants, corresponding to PO '843, in the amount of $846,076.15. A true and correct copy of Invoice '656 is attached hereto as **Exhibit B**.

29. At significant expense, Agira procured the spare parts required to satisfy PO '843 from suppliers in the United States and delivered the goods associated with Invoice '656 on or about April 30, 2016, in Miami, Florida. The Defendants accepted such goods.

30. Agira's delivery of the goods constituted acceptance of PO '843 and formed a binding contract between the Parties.

    **C.**    <u>**Invoice '655**</u>

31. On or about March 11, 2015, the Defendants issued Request for Quotation no. 6000443730 ("Request '730") to Agira, also for the delivery of spare parts related to separately requested new compressors.

32. On or about April 29, 2015, the Defendants issued Purchase Order no. 5100122517 ("PO '517") for the purchase of the spare parts requested pursuant to Request '730. A true and correct copy of PO '517 is attached hereto as **Exhibit C**.

33. On information and belief, the Defendants prepared PO '517 in Houston, Texas. The Defendants instructed Agira to send its invoice to the Defendants in Houston, Texas.

34. On or about January 22, 2016, Agira issued Invoice no. 0099-00000655 ("Invoice '655") to the Defendants, corresponding to PO '517, in the amount of $24,681.60. A true and correct copy of Invoice '656 is attached hereto as **Exhibit D**.

35. At significant expense, Agira procured the spare parts required to satisfy PO '517 from suppliers in the United States and delivered the goods associated with Invoice '655 on or about February 12, 2016, in Miami, Florida. The Defendants accepted such goods.

36. Agira's delivery of the goods constituted acceptance of PO '517 and formed a binding contract between the Parties.

37. The combined value of Invoice '655 and Invoice '656 (collectively, the "Invoices") is $870,757.75.

D. **The Defendants' Failure to Pay**

38. Consistent with their course of performance for prior orders, the Defendants did not immediately pay the Invoices.

39. On or about November 10, 2017, the Defendants acknowledged their payment obligation for the Invoices and promised to pay.

40. On or about June 5, 2018, Agira sent a letter to the Defendants demanding payment of the Invoices and declaring that the Defendants breached their payment obligations.

E. **The Arbitration and Award**

41. On or about September 18, 2018, Agira submitted a request for arbitration to the International Chamber of Commerce, International Court of Arbitration Secretariat (the "ICC"), requesting arbitration involving a dispute over the Invoices and other unpaid invoices issued to the Defendants (the "Arbitration").

42. Agira invoked the agreement to arbitrate from the "Terms and Conditions for Goods Purchases" included in a request for quotation pertaining to several unpaid invoices, which representatives from Agira and the Defendants signed in 2012. Those Terms and Conditions for Goods Purchases provide that they are to be governed by the law of The Netherlands and any dispute arising therefrom would be settled by arbitration under the Rules of the ICC International Court of Arbitration with its legal seat at The Hague.

43. Agira reasonably believed that these Terms and Conditions for Goods Purchases controlled all subsequent purchase orders because these Terms and Conditions were signed, and all purchase orders incorporated by reference the "present standard BARIVEN, S.A. . . . Terms

9

and Conditions which are already in your possession." Moreover, some of the purchase orders did not contain their own terms and conditions.

44. Following commencement of the Arbitration, the ICC and, later, the tribunal constituted to adjudicate the Arbitration (the "Tribunal") undertook extensive efforts to serve the Defendants, as respondents in the Arbitration, with all communications, pleadings, and other documents in the Arbitration.

45. The Defendants never appeared in the Arbitration.

46. Upon information and belief, the Defendants received adequate notice of the arbitration and elected not to participate.

47. Because the Defendants never appeared in the Arbitration, they never raised any defenses, including any jurisdictional defenses, to Agira's claims.

48. On April 9, 2021— roughly two years and seven months after the commencement of the Arbitration—the Tribunal issued a final award (the "Award"). A true and correct copy of the Award is attached hereto as **Exhibit E**.

49. To Agira's surprise, the Tribunal held that the arbitration clause found in the Terms and Conditions for Goods Purchases of the 2012 request for quotation only supported its jurisdiction over Agira's claims for nonpayment of certain invoices issued pursuant to purchase orders tied to that specific request for quotation. The Tribunal declined to exercise jurisdiction over Agira's claims for nonpayment of the Invoices because PO '843 and PO '517 contained their own Terms and Conditions for Goods Purchases, which contained a choice-of-forum clause designating "the applicable State and Federal courts of Harris County, Texas" *in addition* to incorporating the Terms and Conditions for Goods Purchases. The Tribunal concluded that PO '843 or PO '517 did not incorporate by reference the Terms and Conditions for Goods Purchases

in the 2012 request for quotation, or another, free-standing, version of the Terms and Conditions for Goods Purchases in Agira's possession.

## CAUSES OF ACTION

### COUNT ONE
### Breach of Contract

50. Agira incorporates all of the preceding paragraphs by reference as if fully set forth herein.

51. The Defendants entered into a valid, enforceable, binding contract with Agira as evidenced by PO '843 and Invoice '656 for the purchase of certain spare parts for $846,076.15.

52. The Defendants entered into a valid, enforceable, binding contract with Agira as evidenced by PO '517 and Invoice '655 for the purchase of certain spare parts for $24,681.60.

53. Agira fully performed its obligations under these contracts by delivering the spare parts— deliveries that the Defendants accepted.

54. All conditions precedent have been satisfied.

55. The Defendants breached the agreements by failing and refusing to pay the Invoices upon Agira's demand on June 5, 2018.

56. Agira has been damaged by this breach in the amount of $870,757.75 and any and all interest on such amount.

### COUNT TWO
### Sworn Account

57. Agira incorporates all of the preceding paragraphs by reference as if fully set forth herein.

58. Pursuant to Rule 185 of the Texas Rules of Civil Procedure, Agira brings this claim for a suit on sworn account.

59. Agira sold and delivered goods to the Defendants, for which the Defendants agree to pay a total of $870,757.75.

60. The prices charged were just and true because they were according to the terms of the purchase orders and invoices that governed the sale, which provided that the Defendants agreed to pay Agira in exchange for the goods sold.

61. All lawful offsets, payments, and credits have been applied to the account.

62. The account remains unpaid as of the filing of this complaint.

63. The damages are liquidated and total $870,757.75.

64. The sworn affidavit of Agira's Executive Director, Carlos Scioli, verifying this information, is attached hereto as **Exhibit F**.

## COUNT THREE
### (in the alternative)
### Quantum Meruit

65. Agira incorporates all of the preceding paragraphs by reference as if fully set forth herein.

66. Agira provided valuable materials to the Defendants in the form of spare parts sourced from the United States.

67. The Defendants accepted those materials from Agira.

68. Given the circumstances of the exchange, the Defendants had reasonable notice that Agira expected compensation in exchange for the materials provided.

69. The Defendants have failed to pay compensation for these materials, and as a result, have been unjustly enriched.

70. As a result of the Defendants' actions, Agira has suffered damages.

## COUNT FOUR
### (in the alternative)
### Promissory Estoppel

71. Agira incorporates all of the preceding paragraphs by reference as if fully set forth herein. In the alternative to the breach of contract and suit on sworn account claims, Agira asserts this promissory estoppel claim based on Defendants' promise to pay.

72. As of at the earliest, November 10, 2017, the Defendants made a promise to Agira to pay for the spare parts that the Defendants ordered and accepted.

73. Agira reasonably relied on the Defendants' promise to its detriment by waiting to demand payment and forgoing a declaration that the Defendants were in breach of contract until June 2018.

74. Given the circumstances of the exchange, Agira's reliance on the Defendants' promise was foreseeable to the Defendants.

75. Injustice can be avoided only by enforcing the Defendants' promise to pay compensation to Agira for the specialized materials and spare parts that the Defendants accepted.

## **EQUITABLE TOLLING**

76. Agira incorporates all of the preceding paragraphs by reference as if fully set forth herein.

77. Because of the Defendants' shoddy contracting practices, by which they sent Agira multiple overlapping, but materially different, Terms and Conditions for Goods Purchases that appeared to cover the same transactions, Agira reasonably relied on the arbitration clause in the executed Terms and Conditions for Goods Purchases included in the 2012 request for quotation to believe that the arbitration clause controlled its dispute with the Defendants over nonpayment of

the Invoices. Agira's attempt to vindicate its right to payment of the Invoices through arbitration was in good faith.

78.     Moreover, the Defendants concealed the fact that their dispute with Agira over the Invoices may not have been arbitrable by failing to participate in the Arbitration or otherwise challenge the jurisdiction of the Tribunal.

79.     Agira actively pursued its claims against the Defendants for nonpayment of the Invoices during the statutory limitations period, but, as a result of the Defendants' concealment of material facts concerning arbitrability, it spent two years and seven months pursuing these remedies in the wrong forum.

80.     Because of the Defendants' concealment and misrepresentation of facts concerning the applicable terms and conditions and the resulting arbitrability of Agira's claims for nonpayment of the Invoices and Agira's reasonable reliance thereupon, the Defendants should be equitably estopped from invoking a statute of limitations defense based on the two years and seven months that the Arbitration was pending.

## ALTER EGO

81.     Agira incorporates all of the preceding paragraphs by reference as if fully set forth herein.

*Veil-Piercing*

82.     Defendant Bariven is Defendant PDVSA's alter ego.[6]

---

[6] Courts around the world have already recognized that PDVSA and Bariven are alter egos, and that PDVSA is liable for the debts of Bariven. *See, e.g.*, Rechtbank [Rb.] Den Haag [District Court of The Hague] Mar 30, 2022, ECLI:NL:RBDHA:2022:2780 (APS/Bariven & PDVSA) (Neth.); Rechtbank [Rb.] Den Haag [District Court of The Hague] Mar 30, 2022, ECLI:NL:RBDHA:2022:2781 (IGS/Bariven & PDVSA); Rechtbank [Rb.] Den Haag [District Court of The Hague] Mar 30, 2022, ECLI:NL:RBDHA:2022:2782 (SGCC/Bariven & PDVSA).

83. Bariven was organized and operated as a mere tool or business conduit of PDVSA. Bariven sole purpose to purchase materials necessary for PDVSA's own operations. Bariven does not engage in any independent commercial activities. The "shipping marks" of Bariven's purchase orders designate Bariven and PDVSA interchangeably as consignees.

84. PDVSA dominates and controls Bariven to such an extent that no corporate separateness exists. On information and belief, PDVSA directly holds all of the shares in Bariven. On information and belief, directors of PDVSA are appointed as directors of Bariven and impose PDVSA's policies on Bariven, which become Bariven's policies. On information and belief, PDVSA does not observe corporate formalities with respect to Bariven.

85. Bariven is a sham entity created by PDVSA to perpetrate fraud. On information and belief, Bariven owns few, if any, assets, but assumes all, or nearly all, of PDVSA's procurement liabilities. On information and belief, PDVSA does not pay Bariven fair market value for the goods Bariven procures on its behalf. On information and belief, PDVSA has separated its assets from liabilities in this way so as to defraud its vendors, whose only direct recourse for payment on the sale of goods to PDVSA is against the empty shell that is Bariven.

86. PDVSA used Bariven to perpetrate an actual fraud against Agira. Agira shipped valuable goods *to* PDVSA for use *by* PDVSA, but, by contracting through Bariven, PDVSA intended to limit Agira's recourse to the empty shell that is Bariven.

87. As result of the foregoing, PDVSA is liable for Bariven's debts to Agira.

*Reverse Veil-Piercing*

88. Defendant PDVSA Houston is PDVSA (and by extension Bariven's) alter ego.

89. PDVSA Houston was organized and operated as a mere tool or business conduit of PDVSA. PDVSA Houston's sole purpose is to assist with, and act as purchasing agent, for

purchase materials necessary for PDVSA's own operations. PDVSA Houston does not engage in any independent commercial activities.

90. PDVSA dominates and controls PDVSA Houston to such an extent that no corporate separateness exists. On information and belief, PDVSA directly or indirectly holds all of the shares in PDVSA Houston. On information and belief, PDVSA imposes PDVSA's policies on PDVSA Houston, which become PDVSA Houston's policies. On information and belief, PDVSA does not observe corporate formalities with respect to PDVSA Houston.

91. PDVSA Houston is a sham entity created by PDVSA to perpetrate fraud. On information and belief, PDVSA causes PDVSA Houston to hold assets properly belonging to PDVSA to keep them out of the reach of Bariven's (and by extension PDVSA's) creditors.

92. PDVSA used PDVSA Houston to perpetrate an actual fraud against Agira. Through Bariven, PDVSA incurred a debt to Agira, but PDVSA caused some of its assets, which would otherwise be available to satisfy this debt to be held by PDVSA Houston.

93. As result of the foregoing, PDVSA Houston is liable for Bariven's (and by extensions PDVSA's) debts to Agira.

## CONDITIONS PRECEDENT

94. All conditions precedent to recovery for all relief requested have been satisfied or waived.

## ATTORNEYS' FEES

95. Agira seeks attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

96. As a result of the Defendants' actions, Agira has been forced to retain the legal services of the undersigned attorneys to protect and pursue these claims on its behalf.

97.     Agira hereby demands all reasonable expenses, costs, and attorneys' fees incurred in pursuing this action.

## JURY DEMAND

98.     Pursuant to Federal Rule of Civil Procedure 38, Agira hereby makes a demand for a jury trial on all issues properly triable to a jury.

## CONCLUSION AND PRAYER

**FOR THESE REASONS**, Plaintiff Agira respectfully requests this Court:

A.      Enter a judgment against Defendants in the amount of $870,757.75 for breaching the contracts *or* as the amount owed on a sworn contract;

B.      Alternatively, enter a judgment against Defendants that no valid and enforceable contract exists, that Defendants were unjustly enriched by retaining goods delivered by Agira, and that Agira is entitled to payment in the amount of $870,757.75 for delivering those goods;

C.      Declare that Defendants are alter egos of each other and that each Defendant is jointly and severally liable for any judgment;

D.      Award pre- and post-judgment interest as provided by law;

E.      Award attorneys' fees; and

F.      Award such other or further relief to which Agira may be entitled.

Dated: May 21, 2024                                         Respectfully submitted,

*Michelle E. Gray*
Michelle E. Gray
**OF COUNSEL**
Texas Bar No. 24078586
S.D. Tex. Bar No. 892270
FOLGER BRAR O'NEIL GRAY LLP

2 Houston Center
909 Fannin, Suite 1640
Houston, Texas 77010
713-325-8243 (Telephone)
mgray@foglerbrar.com

Peter Fox (pro hac vice forthcoming)
***LEAD COUNSEL***
SCOOLIDGE PETERS RUSSOTTI & FOX LLP
2 Park AVENUE
New York, New York 10016
(212) 729-7708
pfox@sprfllp.com

*Counsel for Plaintiff Agira, S.A.*